## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| KENNETH FETTING, | Case No. _____ |
| Plaintiff, | |
| v. | JURY TRIAL DEMANDED |
| SQUARE, INC., JACK DORSEY, ROELOF BOTHA, AMY BROOKS, SHAWN CARTER, PAUL DEIGHTON, RANDALL GARUTTI, JAMES MCKELVEY, MARY MEEKER, ANNA PATTERSON, LAWRENCE SUMMERS, DAVID VINIAR, and DARREN WALKER, | |
| Defendants. | |

## COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934

Plaintiff, Kenneth Fetting ("Plaintiff"), by his undersigned attorneys, for this Complaint against Defendants, alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, the investigation of counsel, as to all other allegations herein, as follows:

## NATURE OF THE ACTION

1.      This is an action brought by Plaintiff against Square, Inc. ("Square" or the "Company") and the members of the Company's board of directors (collectively referred to as the "Board" or the "Individual Defendants" and, together with Square, the "Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a) and Rule 14a-9, 17 C.F.R. § 240.14a-9. Plaintiff's claims arise in connection with the proposed acquisition of Afterpay Limited ("Afterpay") by Square ("Proposed Transaction"). Plaintiff also asserts a claim against the Individual Defendants for breaching their

1

fiduciary duty of candor/disclosure under Delaware law.

2.      On August 2, 2021, the Company, Lanai (AU) 2 Pty Ltd ("Square Sub"), an indirect wholly owned subsidiary of Square, and Afterpay entered into a Transaction Agreement, whereby all outstanding Afterpay ordinary shares will be transferred to Square Sub and the holders of such Afterpay ordinary shares will have the right to receive, for each such share, either: (1) 0.375 shares of Square Class A common stock ("New Square Shares"); or (2) 0.375 CHESS Depositary Interests ("New Square CDIs" and together with the New Square Shares, the "Scheme Consideration"), representing ownership interest in shares of Square Class A common stock issued by Square.  If the Proposed Transaction is consummated, Afterpay will become a wholly owned subsidiary of Square Sub and an indirect wholly owned subsidiary of Square.

3.      On October 5, 2021, in order to convince the Company's public common shareholders to vote in favor of the Proposed Transaction, Defendants authorized the filing of a materially incomplete and misleading Definitive Proxy Statement ("Proxy") with the SEC, in violation of Sections 14(a) and 20(a) of the Exchange Act.

4.      In particular, the Proxy contains materially incomplete and misleading information concerning: (i) the financial projections for Square and Afterpay; (ii) the financial analyses performed by the Company's financial advisor, Morgan Stanley & Co. LLC ("Morgan Stanley") in connection with the Proposed Transaction; (iii) the potential conflicts of interest for Morgan Stanley; and (iv) the sale process that resulted in the Proposed Transaction.

5.      The special meeting of Square shareholders to vote on the Proposed Transaction is set for November 3, 2021 ("Shareholder Vote").  Therefore, it is imperative that the material information omitted from the Proxy is disclosed prior to the Shareholder Vote, so the Company's shareholders can properly exercise their corporate voting rights.

6.      For these reasons, and as set forth in detail herein, Plaintiff asserts claims against Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act and Rule 14a-9. Plaintiff seeks to enjoin Defendants from taking any steps to consummate the Proposed Transaction, unless and until the material information discussed below is disclosed to Square shareholders sufficiently before the Shareholder Vote or, in the event the Proposed Transaction is consummated, to recover damages resulting from Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction over all claims asserted herein pursuant to Section 27 of the 1934 Act because the claims asserted herein arise under Sections 14(a) and 20(a) of the 1934 Act and Rule 14a-9.

8.      Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over each Defendant by this Court permissible under the traditional notions of fair play and substantial justice.  "Where a federal statute such as Section 27 of the [Exchange] Act confers nationwide service of process, the question becomes whether the party has sufficient contacts with the United States, not any particular state."  *Sec. Inv'r Prot. Corp. v. Vigman*, 764 F.2d 1309, 1315 (9th Cir. 1985).  "[S]o long as a defendant has minimum contacts with the United States, Section 27 of the Act confers personal jurisdiction over the defendant in any federal district court."  *Id.* at 1316.

9.      Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as 28 U.S.C. § 1391, because Defendants are found or are inhabitants or transact business in this District.  Indeed, Square's common stock trades on the New York Stock Exchange

("NYSE"), which is headquartered in this District. *See, e.g., United States v. Svoboda*, 347 F.3d 471, 484 n.13 (2d Cir. 2003) (collecting cases).  Further, Square's counsel in connection with the Proposed Transaction, Wachtell, Lipton, Rosen, & Katz is located in this District at 51 West 52nd Street, New York, NY 10019.

## PARTIES

10.     Plaintiff is, and has been continuously throughout all times relevant hereto, the owner of Square common stock.

11.     Defendant Square is a public company incorporated under the laws of Delaware with principal executive offices located at 1455 Market Street, San Francisco, CA 94103. As mentioned above, the Company's common stock trades on the NYSE under the ticker symbol "SQ."

12.     Defendant Jack Dorsey is, and has been at all relevant times, co-founder of the Company, along with its director, Chairman of the Board, and Chief Executive Officer.

13.     Defendant Roelof Botha is, and has been at all relevant times, a director of the Company.

14.     Defendant Amy Brooks is, and has been at all relevant times, a director of the Company.

15.     Defendant Shawn Carter is, and has been at all relevant times, a director of the Company.

16.     Defendant Paul Deighton is, and has been at all relevant times, a director of the Company.

17.     Defendant Randall Garutti is, and has been at all relevant times, a director of the Company.

18.     Defendant James McKelvey is, and has been at all relevant times, a director of the Company.

19.     Defendant Mary Meeker is, and has been at all relevant times, a director of the Company.

20.     Defendant Anna Patterson is, and has been at all relevant times, a director of the Company.

21.     Defendant Lawrence Summers is, and has been at all relevant times, a director of the Company ("Defendant Summers").

22.     Defendant David Viniar is, and has been at all relevant times, a director of the Company.

23.     Defendant Darren Walker is, and has been at all relevant times, a director of the Company.

24.     Defendants identified in paragraphs 12 through 23 are collectively referred to herein as the "Board" or the "Individual Defendants," and together with the Company, the "Defendants."

**SUBSTANTIVE ALLEGATIONS**

**I.      Background of Square, Afterpay, and the Proposed Transaction**

25.     Square, together with its subsidiaries, creates tools that enables sellers to accept card payments and provides reporting and analytics, and next-day settlement. The Company provides hardware products, including Magstripe reader, which enables swiped transactions of magnetic stripe cards; Contactless and chip reader that accepts Europay, MasterCard, and Visa (EMV) chip cards and Near Field Communication payments; Square Stand, which enables an iPad to be used as a payment terminal or full point of sale solution; Square Register that combines its

hardware, point-of-sale software, and payments technology; Square Terminal, a payments device and receipt printer to replace traditional keypad terminals, which accepts tap, dip, and swipe payments. The Company also offers various software products, including Square Point of Sale; Square Appointments; Square for Retail; Square for Restaurants; Square Online and Square Online Checkout; Square Invoices; Square Virtual Terminal; Square Team Management; Square Contracts; Square Loyalty, Marketing, and Gift Cards; and Square Dashboard.  In addition, it offers a developer platform, which includes application programming interfaces and software development kits. Further, Sqaure provides Cash App, which enables to send, spend, and store money; and Weebly that offers customers website hosting and domain name registration solutions. Square serves in the United States, Canada, Japan, Australia, and the United Kingdom.

26.    Afterpay, an Australian public company limited by shares and registered in Victoria under Australian law, provides payment solutions to customers, merchants, and businesses. Its Afterpay Asia Pacific segment operates the Afterpay platforms in Australia, New Zealand, and Asia. Its Afterpay North America segment operates the Afterpay platforms in the United States and Canada. Its Clearpay segment operates the Clearpay platforms in the United Kingdom and Europe. Afterpay's Pay Now segment provides mobility, health, and e-services.

27.    According to the August 1, 2021, joint press release announcing the Proposed Transaction:

**Square, Inc. Announces Plans to Acquire Afterpay, Strengthening and Enabling Further Integration Between its Seller and Cash App Ecosystems**

**SAN FRANCISCO and MELBOURNE, AUSTRALIA – August 1, 2021 (PDT)** – Square, Inc. (NYSE: SQ) and Afterpay Limited (ASX: APT) today announced that they have entered into a Scheme Implementation Deed under which Square has agreed to acquire all of the issued shares in Afterpay by way of a recommended court-approved Scheme of Arrangement. The transaction has an implied value of approximately US$29 billion (A$39 billion) based on the closing price of Square common stock on July 30, 2021, and is expected to be paid in all stock. The acquisition aims to enable the companies to better deliver compelling

financial products and services that expand access to more consumers and drive incremental revenue for merchants of all sizes. The closing of the transaction is expected in the first quarter of calendar year 2022, subject to the satisfaction of certain closing conditions outlined below.

"Square and Afterpay have a shared purpose. We built our business to make the financial system more fair, accessible, and inclusive, and Afterpay has built a trusted brand aligned with those principles," said Jack Dorsey, Co-Founder and CEO of Square. "Together, we can better connect our Cash App and Seller ecosystems to deliver even more compelling products and services for merchants and consumers, putting the power back in their hands."

Afterpay, the pioneering global 'buy now, pay later' (BNPL) platform, will accelerate Square's strategic priorities for its Seller and Cash App ecosystems. Square plans to integrate Afterpay into its existing Seller and Cash App business units, enable even the smallest of merchants to offer BNPL at checkout, give Afterpay consumers the ability to manage their installment payments directly in Cash App, and give Cash App customers the ability to discover merchants and BNPL offers directly within the app.

"Buy now, pay later has been a powerful growth tool for sellers globally," said Alyssa Henry, Lead of Square's Seller business. "We are thrilled to not only add this product to our Seller ecosystem, but to do it with a trusted and innovative team."

"The addition of Afterpay to Cash App will strengthen our growing networks of consumers around the world, while supporting consumers with flexible, responsible payment options," said Brian Grassadonia, Lead of Square's Cash App business. "Afterpay will help deepen and reinforce the connections between our Cash App and Seller ecosystems, and accelerate our ability to offer a rich suite of commerce capabilities to Cash App customers."

Afterpay is an industry leader with a best-in-class product and strong cultural alignment with Square. As of June 30, 2021, Afterpay serves more than 16 million consumers and nearly 100,000 merchants globally, including major retailers across key verticals such as fashion, homewares, beauty, sporting goods and more. Afterpay empowers consumers to access the things they want and need, while allowing them to maintain financial wellness and control. Afterpay also assists merchants in growing their businesses by helping to drive repeat purchases, increase average transaction sizes, and provide their buyers with the ability to pay over time. Afterpay is deeply committed to helping people spend responsibly without incurring service fees for those who pay on time, interest, or revolving debt, and supports consumers in a number of countries across APAC, North America and Europe (including under its Clearpay brand).

"By combining with Square, we will further accelerate our growth in the U.S. and globally, offer access to a new category of in-person merchants, and provide a

broader platform of new and valuable capabilities and services to our merchants and consumers. We are fully aligned with Square's purpose and, together, we hope to continue redefining financial wellness and responsible spending for our customers," said Anthony Eisen and Nick Molnar, Afterpay Co-Founders and Co-CEOs. "The transaction marks an important recognition of the Australian technology sector as homegrown innovation continues to be shared more broadly throughout the world. It also provides our shareholders with the opportunity to be a part of future growth of an innovative company aligned with our vision."

(Emphasis in original).

## II.    The Proxy Omits Material Information

28.    Defendants filed a materially incomplete and misleading Proxy with the SEC, despite the Individual Defendants being obligated to carefully review the Proxy before it was filed with the SEC and disseminated to the Company's shareholders, to ensure that it did not contain any material misrepresentations or omissions.  Thus, the Proxy should be amended prior to the Shareholder Vote, so Square shareholders can make an informed voting decision in connection with the Proposed Transaction.

29.    First, the Proxy fails to disclose material information regarding the financial projections for Square and Afterpay.

30.    Here, the Proxy fails to disclose the figures underlying the inputs utilized to calculate Adjusted EBITDA and Unlevered Free Cash Flow ("UFCF") for the Square Consensus Projections.  The Proxy discloses that Adjusted EBITDA was calculated using net income or loss, yet the net income figures are not provided. Indeed, net income projections are a crucial metric for shareholders to be apprised of when evaluating a transaction. *See Campbell v. Transgenomic, Inc.*, 916 F.3d 1121, 1125 (8th Cir. 2019) ("The disclosure of Precipio's net income/loss figures could have significantly altered the total mix by informing shareholders about pre-merger Precipio's net income/loss.").  As for UFCF, the Proxy provides that it was calculated using the impact of stock-based compensation expense, taxes, capital expenditures, change in net-working

capital and capitalized expenses, yet the figures underlying these inputs are omitted as well.

31.     Similarly, for the Afterpay Selected Street Projections and the Afterpay Standalone Projections respectively, the Proxy does not provide the figures underlying the inputs used to calculate Adjusted EBITDA and Levered Free Cash Flow ("LFCF").  In this case, the Proxy discloses that LFCF was calculated using the impact of net cash financing expenses, stock-based compensation expense, taxes, capital expenditures and capitalized expenses, yet the figures underlying these inputs are omitted.  To that same effect, Adjusted EBITDA was calculated using net loss, yet the figures underlying the net loss inputs were not disclosed.

32.     Further, for the Synergy Projections, the Proxy also omits the figures underlying the inputs used to calculate LFCF.

33.     Unlike poker where a player must conceal his unexposed cards, the object of a proxy statement is to put all of one's cards on the table face-up. In this case, only some of the cards were exposed—the others were concealed. If a proxy statement discloses financial projections and valuation information, such projections must be complete and accurate.  The question here is not the duty to speak, but liability for not having spoken enough. With regard to future events, uncertain figures, and other so-called soft information, a company may choose silence or speech elaborated by the factual basis as then known—but it may not choose half-truths. *See Campbell*, 916 F.3d at 1125 (noting that "half-truths" are actionable misrepresentations under securities laws and collecting cases).

34.     Second, the Proxy omits material information concerning Morgan Stanley's financial analyses performed in connection with the Proposed Transaction.

35.     For Morgan Stanley's *Afterpay Public Trading Comparables Analysis*, the Proxy omits the individual multiples observed for each of the comparable companies selected, which

included Square. Additionally, the mean and median multiples observed by Morgan Stanley were not disclosed.  Further, the Proxy fails to disclose Afterpay's total debt and the number of ordinary shares of Afterpay on a fully diluted basis.

36.     Similarly, for the *Square Public Trading Comparables Analysis*, the Proxy fails to disclose the individual multiples observed for each of the comparable companies selected, which included Afterpay, and the mean and median multiples observed by Morgan Stanley. Moreover, the Proxy omitted the Company's total debt and the number of ordinary shares of Square on a fully diluted basis.

37.     With respect to the *Afterpay Discounted Equity Value Analysis*, the Proxy fails to disclose the inputs and assumptions underlying Morgan Stanley's application of the capital asset pricing model used to arrive at Afterpay's estimated cost of equity, which in turn was used to select the discount rate of 9.0% and the hurdle rate of 15%.

38.     To that same effect, for the *Square Discounted Equity Value Analysis*, the Proxy fails to disclose the inputs and assumptions underlying Morgan Stanley's application of the capital asset pricing model used to arrive at Square's estimated cost of equity, which in turn was used to select the discount rate of 11.2% and the hurdle rate of 15%.

39.     Regarding Morgan Stanley's *Afterpay Discounted Cash Flow Analysis*, the Proxy fails to disclose the inputs and assumptions underlying: (i) Morgan Stanley's application of the capital asset pricing model used to arrive at Afterpay's estimated cost of equity, which in turn was used to select the discount rate ranging from 8.0% to 10.0%; and (ii) the perpetual growth rates of 3.5% to 4.5% utilized.

40.     As for the *Square Discounted Cash Flow Analysis*, the Proxy omits the inputs and assumptions underpinning: (i) Morgan Stanley's application of the capital asset pricing model

used to arrive at Square's estimated cost of equity, which in turn was used to select the discount rate ranging from 10.0% to 12.0%; and (ii) the perpetual growth rates of 3.5% to 4.5% utilized by Morgan Stanley.

41.     These key inputs are material to the Company's shareholders, and its omission renders the summary of Morgan Stanley's two *Discounted Cash Flow Analyses* incomplete and misleading.  As one highly-respected law professor explained regarding these crucial inputs, in a discounted cash flow analysis, a banker takes management's forecasts and then makes several key choices "each of which can significantly affect the final valuation."  Steven M. Davidoff, Fairness Opinions, 55 Am. U.L. Rev. 1557, 1576 (2006).  Such choices include "the appropriate discount rate, and the terminal value…"  *Id.*  As Professor Davidoff explains:

> *There is substantial leeway to determine each of these, and any change can markedly affect the discounted cash flow value.  For example, a change in the discount rate by one percent on a stream of cash flows in the billions of dollars can change the discounted cash flow value by tens if not hundreds of millions of dollars*….This issue arises not only with a discounted cash flow analysis, but with each of the other valuation techniques. *This dazzling variability makes it difficult to rely, compare, or analyze the valuations underlying a fairness opinion* **unless full disclosure is made of the various inputs in the valuation process, the weight assigned for each, and the rationale underlying these choices**. The substantial discretion and lack of guidelines and standards also makes the process vulnerable to manipulation to arrive at the "right" answer for fairness.  This raises a further dilemma in light of the conflicted nature of the investment banks who often provide these opinions.

*Id.* at 1577-78 (emphasis added). Without the above-mentioned information, Square shareholders cannot evaluate for themselves the reliability of Morgan Stanley's *Discounted Cash Flow Analyses*, make a meaningful determination of whether the implied equity value ranges reflect the true value of the Company and Afterpay, or were the result of an unreasonable judgment by Morgan Stanley, and make an informed decision regarding whether to vote in favor of the Proposed Transaction.

42.     Concerning the *Precedent Transactions Premia* Analysis performed by Morgan Stanley, the Proxy does not provide the individual premiums observed for each of the selected stock transactions, as well as the mean and median premiums observed.

43.     Finally, for Morgan Stanley's *Equity Research Analysts' Future Price Targets* Analysis, the Proxy omits the price targets observed for both Afterpay and the Company, as well as the corresponding analysts.

44.     Third, the Proxy omits critical information concerning potential conflicts of interest for Morgan Stanley in connection with the Proposed Transaction.

45.     To start, the Proxy provides that Morgan Stanley may receive an additional discretionary fee of up to $15 million, of which the amount, if any, will be in Square's sole discretion, and paid upon closing of the Proposed Transaction. Yet, the Proxy fails to disclose the factors that Square will consider in determining whether to award Morgan Stanley this discretionary fee, along with the factors Square will consider in deciding on the amount to award.

46.     Furthermore, the Proxy discloses that in the two years prior to the date of Morgan Stanley's fairness opinion in connection with the Proposed Transaction, Morgan Stanley provided financing services to Square and received aggregate fees of approximately $5 million to $10 million for those services.  However, the Proxy fails to disclose the details and/or nature of those financing services rendered to Square.

47.     Indeed, information that bears on whether an investment bank faces conflicts of interest are material to stockholders when deciding how to vote on a merger because stockholders must be able to understand what factors might influence the advisor's actions. All factors that may entice a financial advisor to favor a particular transaction—including relationships and/or prior or future compensation—must be fully disclosed.

48.     Fourth, the Proxy fails to disclose certain material information relating to the sale process, namely the specific instances where Defendant Summers recused himself from portions of prior Board deliberations on the Proposed Transaction, due to his service on Afterpay's U.S. Advisory Board and his equity interest in Afterpay.  Once a company travels down the road of partial disclosure of the history leading up to a transaction, it has an obligation to provide shareholders with an accurate, full, and fair characterization of those historic events. Even a non-material fact can trigger an obligation to disclose additional, otherwise non-material facts, in order to prevent the initial disclosure from materially misleading the stockholders.

49.     In sum, the omission of the above-referenced information renders the Proxy materially incomplete and misleading, in contravention of the Exchange Act.  Absent disclosure of the foregoing material information prior to the Shareholder Vote concerning the Proposed Transaction, Plaintiff will be unable to make an informed decision regarding whether to vote his shares in favor of the Proposed Transaction, and he is thus threatened with irreparable harm, warranting the injunctive relief sought herein.

## CAUSES OF ACTION

### COUNT I
### (Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9)

50.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

51.     Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or

authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title."  15 U.S.C. § 78n(a)(1).

52.     Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that proxy communications shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. § 240.14a-9.

53.     The omission of information from a proxy will violate Section 14(a) and Rule 14a-9 if other SEC regulations specifically require disclosure of the omitted information.

54.     Defendants have issued the Proxy with the intention of soliciting the Company's public common stockholders support for the Proposed Transaction.  Each of the Individual Defendants reviewed and authorized the dissemination of the Proxy, which fails to provide critical information regarding, amongst other things: (i) the financial projections for Square and Afterpay; (ii) the financial analyses performed by Morgan Stanley in connection with the Proposed Transaction; (iii) the potential conflicts of interest for Morgan Stanley; and (iv) the sale process.

55.     In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading.  Each of the Individual Defendants, by virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a).  The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Proxy, but nonetheless failed to obtain and disclose such information to the Company's shareholders although they could have done so without extraordinary effort.

56.     The Individual Defendants knew or were negligent in not knowing that the Proxy is materially misleading and omits material facts that are necessary to render it not misleading. The Individual Defendants undoubtedly reviewed and relied upon most if not all of the omitted information identified above in connection with their decision to approve and recommend the Proposed Transaction; indeed, the Proxy states that Morgan Stanley reviewed and discussed its financial analyses with the Individual Defendants, and further states that the Individual Defendants considered the financial analyses provided by Morgan Stanley, as well as its fairness opinion and the assumptions made and matters considered in connection therewith.  Further, the Individual Defendants were privy to and had knowledge of the Company and Afterpay's financial projections and the details surrounding the process leading up to the signing of the Transaction Agreement.  The Individual Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the Proxy, rendering the sections of the Proxy identified above to be materially incomplete and misleading.  Indeed, the Individual Defendants were required to, separately, review Morgan Stanley's analyses in connection with their receipt of the fairness opinion, question Morgan Stanley as to its derivation of fairness, and be particularly attentive to the procedures followed in preparing the Proxy and review it carefully before it was disseminated, to corroborate that there are no material misstatements or omissions.

57.     The Individual Defendants were, at the very least, negligent in preparing and reviewing the Proxy.  The preparation of a proxy statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence.  The Individual Defendants were negligent in choosing to omit material information from the Proxy or failing to notice the material omissions in the Proxy upon reviewing it, which they were required to do carefully as the Company's directors.  Indeed, the Individual Defendants were intricately

involved in the process leading up to the signing of the Transaction Agreement, and preparation and review of the Company and Afterpay's financial projections.

58.     Square is also deemed negligent as a result of the Individual Defendants' negligence in preparing and reviewing the Proxy.

59.     The misrepresentations and omissions in the Proxy are material to Plaintiff, who will be deprived of his right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the Shareholder Vote.  Plaintiff has no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

**COUNT II**
**(Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act)**

60.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

61.     The Individual Defendants acted as controlling persons of Square within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of Square, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

62.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the

statements or cause the statements to be corrected.

63.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same.   The Proxy contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction.  They were thus directly involved in preparing this document.

64.     In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Transaction Agreement. The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered.  The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

65.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

66.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

67.     Plaintiff has no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT III
### (Against the Individual Defendants for Breach of Fiduciary Duty of Candor/Disclosure)

68.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

69.     By virtue of their role as directors and/or officers of the Company, the Individual Defendants directly owed Plaintiff and all Company shareholders a fiduciary duty of candor/disclosure, which required them to disclose fully and fairly all material information within their control when they seek shareholder action, and to ensure that the Proxy did not omit any material information or contain any materially misleading statements.

70.     As alleged herein, the Individual Defendants breached their duty of candor/disclosure by approving or causing the materially deficient Proxy to be disseminated to Plaintiff and the Company's other public shareholders.

71.     The misrepresentations and omissions in the Proxy are material, and Plaintiff will be deprived of his right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the Shareholder Vote. Where a shareholder has been denied one of the most critical rights he or she possesses—the right to a fully informed vote—the harm suffered is an individual and irreparable harm.

72.     Plaintiff has no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

### **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.     Preliminarily enjoining Defendants and all persons acting in concert with them from proceeding with the Shareholder Vote or consummating the Proposed Transaction, unless

and until the Company discloses the material information discussed above which has been omitted from the Proxy;

B.      Directing the Defendants to account to Plaintiff for all damages sustained as a result of their wrongdoing;

C.      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

D.      Granting such other and further relief as this Court may deem just and proper.

## <u>JURY DEMAND</u>

Plaintiff demands a trial by jury on all issues so triable.

Dated: October 19, 2021                          **MONTEVERDE & ASSOCIATES PC**

<u>/s/ Juan E. Monteverde        </u>
Juan E. Monteverde (JM-8169)
The Empire State Building
350 Fifth Avenue, Suite 4405
New York, NY 10118
Tel: (212) 971-1341
Fax: (212) 202-7880
Email: jmonteverde@monteverdelaw.com

*Attorneys for Plaintiff*